# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| SNYDERS HEART VALVE LLC,<br><br>Plaintiff,<br><br>v.<br><br>ST. JUDE MEDICAL, LLC; ST. JUDE MEDICAL, CARDIOLOGY DIVISION INC.; and ST. JUDE MEDICAL S.C., INC.,<br><br>Defendants. | Case No. 0:18-cv-02030-JRT-DTS<br><br>**FILED UNDER SEAL** |

## ST. JUDE'S MEMORANDUM OF LAW IN OPPOSITION TO SNYDERS' MOTION TO EXCLUDE CERTAIN PORTIONS OF THE SUPPLEMENTAL REPORTS OF DR. YOGANATHAN, MR. CHANDLER, AND DR. UGONE

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................... 1

II. LEGAL STANDARDS ................................................................................... 4

III. ST. JUDE'S EXPERTS PROPERLY OPINE ON THE INCREMENTAL VALUE OF THE ASSERTED CLAIMS OVER EXISTING TECHNOLOGY ............................................................................................ 4

    A. St. Jude's Experts Properly Conducted An Analysis Under *Georgia-Pacific* Factor 9 ............................................................................... 5

    B. St. Jude's Experts Timely Supplemented Their Earlier Reports ................... 9

II. SNYDERS PROVIDES NO BASIS FOR EXCLUDING THE OPINIONS OF ST. JUDE'S DAMAGES EXPERTS .................................. 12

IV. DR. YOGANATHAN'S LACK OF ENABLEMENT AND WRITTEN DESCRIPTION OPINIONS ARE APPROPRIATE UNDER *DAUBERT* ............. 14

V. CONCLUSION ............................................................................................. 15

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AstraZeneca AB v. Apotex Corp.*,
    782 F.3d 1324 (Fed. Cir. 2015) ................................................................................... 5

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) ............................................................................ 3, 4, 12, 13, 15

*Drone Techs., Inc. v. Parrot S.A.*,
    No. 14cv0111, 2015 WL 12752847 (W.D. Pa. Apr. 9, 2015) ............................. 10, 11

*Exmark Manufac. Co. v. Briggs & Stratton Power Prods. Grp.*,
    LLC, 879 F.3d 1332 (Fed. Cir. 2018) ................................................................ 1, 5, 6, 8

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    318 F.Supp. 1116 (S.D.N.Y. 1970) ............................................................... 1, 5, 6, 8, 13

*LizardTech, Inc.v. Earth Res. Mapping, Inc.*,
    424 F.3d 1336 (Fed. Cir. 2005) ................................................................................. 14

*MagSil Corp. v. Hitachi Global Storage Techs., Inc.*,
    687 F.3d 1377 (Fed Cir. 2012) .................................................................................. 14

*Minks v. Polaris Indus., Inc.*,
    546 F.3d 1364 (Fed. Cir. 2008) ................................................................................... 5

*Robinson v. GEICO Gen. Ins. Co.*,
    447 F.3d 1096 (8th Cir. 2006) .................................................................................... 4

*Ultratec, Inc. v. Sorenson Comm'cns, Inc.*,
    No. 13-cv-346-bbc, 2014 WL 5023098 (W.D. Wis. Oct. 8, 2014) ............................ 11

*Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Varian Med. Sys., Inc.*,
    561 F. App'x 934 (Fed. Cir. 2014) .............................................................................. 1

*Vaporstream, Inc. v. Snap Inc.*,
    No. 2:17-cv-00220, 2020 WL 978731 (C.D. Cal. Feb. 28, 2020) ......................... 8, 13

*Verdegaal Bros. v. Union Oil Co. of Cal.*,
    814 F.2d 628 (Fed. Cir. 1987) ..................................................................................... 2

## I. INTRODUCTION

"[I]f the claimed invention only adds an incremental value to the conventional element(s), the damages awarded must also be so limited." *Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Varian Med. Sys., Inc.*, 561 F. App'x 934, 947 (Fed. Cir. 2014). In the *inter partes* review ("IPR") proceedings, the PTAB cancelled many of Snyders' claims as invalid over prior art, while upholding other claims that differ in minor ways from the cancelled claims. The PTAB's decisions thus confirmed that the differences between Snyders' surviving claims and the prior art are minor, and St. Jude's experts analyzed those minor differences and concluded that their incremental value is low. The Federal Circuit in *Exmark Manufac. Co. v. Briggs & Stratton Power Prods. Grp., LLC* recognized and accepted this methodology, finding it proper to admit prior art evidence to demonstrate to the jury that there were small differences between the invention and prior art when analyzing *Georgia-Pacific* factor number nine. 879 F.3d 1332, 1351-52 (Fed. Cir. 2018).

Snyders does not dispute that calculating "the utility and advantages" of the claims over the prior art can be considered in the reasonable royalty damages analysis. Dkt. 581 at 2. Yet it improperly seeks to exclude St. Jude's experts from using the delta between the cancelled claims—which, as invalid claims, are "conventional element(s)" within the prior art—and the surviving claims to express their opinions regarding the incremental value of the surviving claims. Instead, according to Snyders, St. Jude's experts must use the prior art itself. That is a distinction without a difference—the canceled claims were invalid for anticipation, meaning "each and every element as set forth in the claim[s] [was]

found, either expressly or inherently described, in a single prior art reference" (Dkt. 612-1 (-106 IPR Final Written Decision) at 9 (quoting *Verdegaal Bros. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987)), and by definition every element is in the prior art. The linguistic phrase used to explain the methodology does not change that the opinions are appropriately directed to the incremental value of the claims over the prior art.

Moreover, St. Jude's experts did compare the claims that survived the PTAB to the prior art and explained that many of their elements are conventional and known, and that the additional elements have low incremental value. For example, Dr. Yoganathan opined in his 2017 invalidity report that claims 1 and 2 of the '782 Patent are anticipated by Bessler (Dkt. 619, Ex. Y1 at Ex. E), an opinion the PTAB confirmed (Dkt. 612-1 at 27-28). And with respect to surviving claim 4, which depends from claims 1 and 2 and includes all of their conventional limitations, in his 2020 report, Dr. Yoganathan observed that "the artificial valve taught by Bessler provides a solution for implanting a prosthetic valve through the femoral artery by collapsing to less than 6 mm in order to allow transfemoral delivery." Dkt. 619, Ex. Y2 ¶ 37. Thus, because "[t]he stated utility and advantage of providing an artificial valve that is collapsible to maximum widths within the claimed ranges is to enable non-invasive, transluminal implantation through a blood vessel like the femoral artery, which was known prior the '782 Patent to be approximately 5-12 mm in diameter," and because "many solutions including collapsible, nitinol prosthetic heart valves that predate the '782 Patent already described and provided these

2

same features," Dr. Yoganathan concluded that claim 4 "provide[s] little, if any, utility or advantages over existing technology." *Id.* ¶ 42.

Snyders further argues that St. Jude's analysis is both too early and too late: too early because the Federal Circuit has not yet ruled on the PTAB's decisions, and too late because St. Jude should have somehow analyzed the PTAB's decisions before they existed. Neither argument has any merit, and the timing is just right—St. Jude timely supplemented its expert reports to account for the PTAB decisions as the Court's schedule required. *See* Dkts. 439, 507.

Additionally, Snyders seeks to exclude Dr. Yoganathan's supplemental opinions regarding lack of written description and enablement under Snyders' "single-leaflet" infringement theory because Snyders "was not required to enable or provide a written description for every possible embodiment," because Dr. Yoganathan's opinions are "based on a false premise," and the "hypothetical valve would not fall within the scope of Dr. Snyders' patent claims." Dkt. 581 at 7-8. But these are mere disagreements, which go to the weight of the evidence, which Snyders is free to explore in cross examination, and do not provide a basis to exclude testimony. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) (explaining the preference for "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" when challenging expert testimony).

Finally, Snyders' only challenge to Dr. Ugone's and Mr. Chandler's damages opinions is that they should be excluded because "no one cares if damages come in at $100,000 instead of $200,000 in this case." Dkt. 581 at 5. This also is not a proper reason

3

to exclude expert testimony under *Daubert*—it is not a challenge to the experts' qualifications or methodology, but a form of disagreement with the opinion to explore on cross-examination, and it is highly relevant to determining the proper amount of damages.

## II.   LEGAL STANDARDS

In weighing the admissibility of proffered expert testimony, the Court considers "whether the reasoning or methodology underlying the testimony is scientifically valid," and "whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93 (1993). *Daubert* "provides a district court with the discretion necessary to close the courtroom door to 'junk science' and to admit reliable expert testimony that will aid the trier of fact." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (citation omitted). Additionally, the Court's "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. In challenging proffered expert testimony, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are preferred over exclusion of the expert. *Id.* at 596.

## III.   ST. JUDE'S EXPERTS PROPERLY OPINE ON THE INCREMENTAL VALUE OF THE ASSERTED CLAIMS OVER EXISTING TECHNOLOGY

Snyders' Motion fails to mount any legally cognizable challenge to the supplemental opinions offered by Dr. Yoganathan, Dr. Ugone, or Mr. Chandler. Indeed, Snyders' Motion does not challenge these experts' qualifications, and does not challenge Dr. Ugone's and Mr. Chandler's methodology. And Snyders' challenge to Dr. Yoganathan's "methodology" elevates form over substance and provides no basis for exclusion.

4

### A. St. Jude's Experts Properly Conducted An Analysis Under *Georgia-Pacific* Factor 9

Snyders argues that "[u]nder *Georgia-Pacific* factor no. 9, what matters is how the claimed invention compares to prior-art devices, not how a confirmed claim of the patent compares to a claim found to be unpatentable." Dkt. 581 at 4. Snyders' arguments are meritless because St. Jude's experts have done precisely the required analysis. *Georgia-Pacific*[1] factor 9 calls for an evaluation of "[t]he utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results." *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). In fact, "apportion[ing] the defendant's profits and the patentee's damages between the patented feature and unpatented features," as noted in Snyders' citation to the *AstraZeneca* decision (Dkt. 581 at 5), is ***exactly*** what the law requires. *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338 (Fed. Cir. 2015). Indeed, Snyders admits that "the advance of the claimed invention over particular prior-art devices can be considered in setting an appropriate royalty rate." Dkt. 581 at 1. That is exactly what Dr. Yoganathan, Dr. Ugone, and Mr. Chandler have done.

The Federal Circuit rejected arguments like Snyders' here in *Exmark*. In that case, the Federal Circuit held it was an abuse of discretion to exclude prior art where Defendant sought to use it to "show[] the jury the small differences between the invention and prior

---

[1] *Georgia-Pacific,* the seminal case relating to determining a reasonable royalty, lists 15 factors often relevant to the reasonable royalty analysis. *See Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1372 (Fed. Cir. 2008) ("A determination of the royalty stemming from a hypothetical negotiation is often made by assessing factors such as those set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970).").

art" under *Georgia-Pacific* factor nine by "demonstrat[ing] that many of the benefits [Plaintiff] attributed to the [distinctive feature of the patent] were already present in the prior art." 879 F.3d at 1351-52. Unable to dispute this, Snyders asserts that "SJM's experts do not offer any actual comparisons between the invention covered by the asserted patent claims and any particular prior-art device." Dkt. 581 at 1.

Snyders is wrong. For example, Dr. Yoganathan compared the elements of claims 1 and 2 to the prior art and concluded that Bessler anticipates those claims. Dkt. 619, Ex. Y1 (2017 Yoganathan Rep.) at Ex. 1, at 1-8 (comparing each element of claims 1 and 2 against Bessler's disclosures); *id.* at Ex. E (concluding that Bessler anticipates claims 1 and 2). The PTAB performed a similar comparison and arrived at the same conclusion. Dkt. 612-1 ('106 IPR Final Written Decision) at 20-28. It cancelled claims 1 and 2 of the '782 patent as anticipated by Bessler, finding that each and every element of these claims was found in Bessler, in combination as claimed. *Id.*; *id.* at 9 ("A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference.") (citation omitted). Dr. Yoganathan opined that the PTAB's cancellations confirm that the limitations of claims 1 and 2 do not provide any utility or advantages over existing technology. Dkt. 619, Ex. Y2 ¶¶ 27-31. But the PTAB also upheld claim 4[2] which differs from cancelled claim 2 by just a single limitation as shown in *italics*:

---

[2] For the purposes of his report, Dr. Yoganathan assumed that the upheld claims are not invalid as anticipated or obvious. Dkt. 619, Ex. Y2 ¶ 7 n.2.

6

> **4.** An artificial valve as set forth in claim 2 *wherein said flexibly resilient frame is collapsible to a configuration having a maximum width less than about 6 mm*.

Dkt. 612-4 ('782 Patent) at cl. 4; Dkt. 612-1 ('106 IPR Final Written Decision) at 28-29. The PTAB's decisions thus made clear that the majority of elements of claim 4 are conventional (*i.e.*, those that reside textually in claims 1-2), and that the only basis for patentability of claim 4 was the additional claim element requiring the claimed "flexibly resilient frame" be "collapsible to a configuration having a maximum width less than about 6 mm." *Id.*

Dr. Yoganathan then opined that taking the valve of Bessler and compressing it down to "less than about 6 mm" provided little to no incremental value over prior art such as Bessler, including because Bessler itself was already compressible enough to be implanted via the femoral artery, the standard route for TAVR access. *E.g.*, Dkt. 619, Ex. Y2 (Yoganathan Supp. Rep.) ¶¶ 37, 42. Further, Dr. Yoganathan explicitly considered how ***other*** prior art, such as Leonhardt and Bailey, impacted the utility and advantages offered by the additional element of claim 4. *See, e.g.*, *id.* ¶¶ 38, 41. Specifically, "[b]oth Leonhardt and Bailey confirm that, prior to the '782 Patent, others had achieved the benefit of delivering a prosthetic heart valve through the femoral artery by collapsing to a width less than about 6 mm or between about 4 mm and about 6 mm in diameter." *Id.* ¶ 38. Dr. Yoganathan offered a similar analysis for each of the other claims that survived the PTAB, thus offering expert opinions as to the incremental utility and advantage, if any, of all of the surviving claims. Dkt. 619, Ex. Y2 (Yoganathan Supp. Rep.) ¶¶ 26-77 (claims 4, 5, 7, and 28), ¶¶ 78-86 (claims 10-13, 18, 19, 21, 22, 25, and 29). Dr. Yoganathan thus conducted

a proper analysis under *Georgia-Pacific* factor nine, and concluded that "the Asserted Claims provide little, if any, utility or advantages over the technology that existed at the time, including prior art." *Id.* ¶ 24.

Snyders next argues that IPR estoppel precludes St. Jude from presenting evidence that the claim elements are found in the prior art. Dkt. 581 at 4-5. Snyders misses the mark. St. Jude does not offer this evidence to establish anticipation or obviousness of the remaining asserted claims, but rather for the *Georgia-Pacific* factor nine analysis that *Exmark* confirms is relevant. 879 F.3d at 1351-52. Another court has rejected Snyders' argument, holding that its "summary judgment ruling [finding IPR estoppel] does not render evidence inadmissible simply because it was relevant to the issue of obviousness provided the evidence remains relevant to a different issue in the case, such as damages through *Georgia-Pacific* factor 9." *Vaporstream, Inc. v. Snap Inc.*, No. 2:17-cv-00220, 2020 WL 978731, *9 (C.D. Cal. Feb. 28, 2020). Like *Vaporstream*, St. Jude will offer this evidence to show that certain elements of the asserted claims are conventional in view of the prior art, and that the asserted claims are of ***low value*** because the same or similar utility and advantages can be found in that prior art. IPR estoppel does not bar St. Jude from arguing that Snyders' patents are of low value. *Exmark Manufac. Co.*, 879 F.3d at 1351-52; *Vaporstream, Inc. v. Snap Inc.*, 2020 WL 978731, *9.

Further, Snyders is incorrect that the "full extent" of these opinions is merely "that each element of the confirmed claims can be found in some prior-art reference." Dkt. 581 at 5. Rather, as shown above, Dr. Yoganathan considered the utility and advantages, if any, offered by each surviving claim as compared to the old modes or devices, including prior

8

art. For example, with respect to claim 4, Dr. Yoganathan explained that "[t]he stated utility and advantage of providing an artificial valve that is collapsible to maximum widths within the claimed ranges is to enable non-invasive, transluminal implantation through a blood vessel like the femoral artery, which was known prior the '782 Patent to be approximately 5-12 mm in diameter." Dkt. 619, Ex. Y2 (Yoganathan Supp. Rep.) ¶ 42. Then, because "many solutions including collapsible, nitinol prosthetic heart valves that predate the '782 Patent already described and provided these same features," Dr. Yoganathan concluded that claim 4 "provide[s] little, if any, utility of advantages over existing technology." *Id.* Thus, Dr. Yoganathan did not merely conclude that the surviving claims have low value because prior art discloses their limitations—his opinion is that those claims provide low value because ***other existing solutions*** provided the same value, resulting in nominal, if any, incremental value over those solutions.

Here, the Court should deny Snyders' Motion because the supplemental opinions presented by Dr. Yoganathan, Dr. Ugone, and Mr. Chandler were the product of cogent and reliable analyses.[3]

## B. St. Jude's Experts Timely Supplemented Their Earlier Reports

Snyders argues that St. Jude's expert opinions should be excluded because they were submitted too late, because according to Snyders, St. Jude "already had a full and fair

---

[3] St. Jude disagrees with Snyders that presenting evidence to the jury of the PTAB's findings that most of elements of the asserted claims are conventional and known in the art "would result in extensive collateral litigation over what happened in the IPR proceedings." Dkt. 581 at 6. However, the fact that elements were conventional and known in the art is something that the parties can stipulate to or the Court can take judicial notice of.

9

opportunity in their original reports to address *Georgia Pacific* factor no. 9" but "[t]hey did not do so." Dkt. 581 at 2, 6. This argument is without merit. Prior to the PTAB's decisions, Dr. Yoganathan opined that all asserted claims were invalid in view of the prior art, and therefore that ***there were no differences*** between Snyders' claims and the old modes and devices that came before them. *See* Dkt. 619, Ex. Y1 ¶ 234; *id.* at Ex. E.

The PTAB's decisions changed this landscape for the surviving claims. The PTAB found that some differences do exist between the prior art and those claims of the '782 Patent that it upheld. *See generally* Dkt. 612-1. Dr. Yoganathan's supplemental report accounts for that finding,[4] which did not exist at the time of his original report. *E.g.*, Dkt. 619, Ex. Y2 ¶¶ 26-32. Because the PTAB's finding regarding the surviving claims obviously did not exist until the PTAB issued its decisions, Dr. Yoganathan timely submitted his opinion on the Court's schedule for the parties to supplement their expert reports to account for the PTAB findings. *See* Dkts. 439, 507.

Snyders' cases are inapposite. *Drone Techs., Inc. v. Parrot S.A.* involved a court's ruling on a motion *in limine* to exclude evidence relating to "***incomplete*** [IPR] proceedings" (*i.e.*, evidence from then-pending IPR proceedings, including the institution decisions). No. 14cv0111, 2015 WL 12752847, at *2 (W.D. Pa. Apr. 9, 2015) (emphasis added). That is nothing like the situation here, where the PTAB has issued final written

---

[4] In his report, Dr. Yoganathan assumes that the PTAB's decisions are upheld on appeal. Before trial, the parties will know whether or not the Federal Circuit has affirmed the PTAB decisions. Ex. 1 (7-25-2019 Oral Order) at 4:15-5:3. Unless stated otherwise, the exhibits cited herein are attached to the concurrently filed Declaration of Joseph W. Winkels.

10

decisions following oral argument. *See generally* Dkt. 612-1. Moreover, the court recognized that "the calculation of a reasonable royalty is premised on the assumption that the patents are valid and infringed." *Drone Techs.*, 2015 WL 12752847, at *2. That is precisely what Dr. Yoganathan assumed in rendering his opinions regarding the utility and advantages of the surviving claims over the prior art. Dkt. 619, Ex. Y2 (Yoganathan Supp. Rep.) ¶ 7 n.2. Additionally, in *Ultratec, Inc. v. Sorenson Comm'cns, Inc.*, defendants expressed an intent to use "evidence as to the pending inter partes review proceedings," which they said was "relevant and admissible to rebut the presumption of validity." Dkt. 583-2 at 4 (also available as No. 13-cv-346, 2014 WL 5023098, at *2 (W.D. Wis. Oct. 8, 2014)). That is not the case here.

In addition to arguing that St. Jude's expert supplementation is too late, Snyders also argues that St. Jude's supplementation is too early. Snyders' Motion asserts that "[b]ecause none of Dr. Snyders' patent claims have actually been cancelled, the PTAB's decisions have no preclusive effect in this action," and that "[b]ecause SJM's experts' new opinions are premised on the existence of binding decisions that certain claims have been found unpatentable," "they are fundamentally flawed and should be excluded." Dkt. 581 at 3-4. However, before trial, the parties will know whether or not the Federal Circuit has affirmed the PTAB decisions, as the Court has stated "that the trial itself should not go forward prior to obtaining a ruling from the Federal Circuit on the parties' cross-appeal." Ex. 1 (7-25-2019 Oral Order) at 4:15-5:3. This Court's scheduling order asked the parties

11

to proceed forward in this case to account for the PTAB's decisions as issued, notwithstanding the appeal, and St. Jude has done so.[5] *Id.*; *see* Dkt. 425; Dkt. 439.

## II. SNYDERS PROVIDES NO BASIS FOR EXCLUDING THE OPINIONS OF ST. JUDE'S DAMAGES EXPERTS

Snyders' only "challenge" to Dr. Ugone's and Mr. Chandler's damages opinions is that that they should be excluded because "no one cares if damages come in at $100,000 instead of $200,000 in this case." Dkt. 581 at 5. This, however, is not a proper reason to exclude expert testimony under *Daubert*—it is not a challenge to the experts' qualifications or methodology. Indeed, it is not clear what Snyders' basis is for exclusion. To the extent Snyders suggests it would be "prejudice[d]" by Dr. Ugone or Mr. Chandler "argu[ing] that every element of Snyders' asserted patent claims are in the prior art" (Dkt. 591 at 6), Snyders' concern is misplaced, because St. Jude's damages experts do not opine on the content of the prior art, and because—as explained above—Dr. Yoganathan assumed the asserted claims are valid and will not offer invalidity opinions based on anticipation or obviousness.

To the extent Snyders suggests Dr. Ugone's or Mr. Chandler's conclusions are cumulative, that too is wrong. St. Jude's experts conducted a supplemental analysis of the incremental value of the claims that survived the PTAB compared to what was already known conventionally, and concluded that any incremental value would be at the lower

---

[5] And it was Snyders who advocated for this procedural posture (Dkt. 407 at 1), while St. Jude urged the Court to stay the case pending appeal to avoid wasting resources to account for decisions that may be reversed (Dkt. 396 at 2).

12

end of the $100,000 to $200,000 range. This is not unreliable or cumulative evidence; rather, by definition, the fact that a different methodology arrived at a similar conclusion *confirms* that Dr. Ugone's and Mr. Chandler's damages opinions in this respect are reliable and not cumulative. And given the huge disparity between the parties' competing damages claims, such evidence is highly probative to rebut Snyders' claim, which is based on a methodology that unreliably and improperly ignores the PTAB's decisions. *See* Dkt. 588 at 8-18. In any event, these are issues for "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," rather than exclusion. *Daubert*, 509 U.S. at 596.

Finally, there is nothing improper with St. Jude's damages experts relying on opinions from St. Jude's technical expert. *Vaporstream, Inc.*, 2020 WL 978731, at *9. "Consistent with Rule 703, patent damages experts often rely on technical expertise outside of their field." *Id.* (citations omitted). Specifically, the *Vaporstream* Court found it proper for a damages expert to rely on a technical expert's analysis of the prior art in conjunction with a *Georgia-Pacific* factor number nine analysis. *Id.* Similarly, here, both Dr. Ugone and Mr. Chandler had conversations with Dr. Yoganathan in forming their opinions regarding the utility and advantages of the alleged invention under *Georgia-Pacific* factor number nine. Ex. 2 (5/6/2020 Ugone Rep) ¶ 6, 8; Ex. 3 (5/6/2020 Chandler Rep) ¶ 4 n.3, ¶¶ 7-8, 19-20. Moreover, so long as a technical foundation for their opinions is in evidence—which could also come through documents or cross-examination of Snyders' fact and expert witnesses—there is no basis to exclude Dr. Ugone's and Mr. Chandler's reports.

13

## IV. DR. YOGANATHAN'S LACK OF ENABLEMENT AND WRITTEN DESCRIPTION OPINIONS ARE APPROPRIATE UNDER *DAUBERT*

Snyders seeks to exclude Dr. Yoganathan's lack of enablement and written description opinions without any basis other than that Snyders disagrees with them. Snyders essentially argues that Dr. Yoganathan's rebuttal opinions should be excluded because Dr. Snyders did not have to enable or provide adequate written description for every possible embodiment, and that the "single leaflet" embodiment is not inoperative or even an embodiment in the first place. Dkt. 581 at 7-8.[6] Snyders is wrong. Dr. Yoganathan applied the correct law to his analysis. Now that Snyders has obtained a broad claim scope, the specification must "demonstrate that the inventor possesses the full scope of the invention" and "enable the full breadth of that claim." *LizardTech, Inc.v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1344-45 (Fed. Cir. 2005). St. Jude does not argue that the specification must enable the Portico device and all of its features, as Snyders suggests. (Dkt. 581 at 7.) But to enable the full scope of the claims in light of the broad claim construction Snyders secured, the specification does need to enable elements that Snyders' contends are within the scope of the claims, such as a "frame" that is a tubular stent and a "valve element" that is a native-type tri-leaflet valve. Plaintiff cannot have it both ways, and its failure on enablement grounds "is a problem of its own making." *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1384 (Fed Cir. 2012).

---

[6] These issues were previously addressed in St. Jude's prior briefing, and are incorporated here. *See* Dkt. 241 at 4-6; Dkt. 243 at 15-26; Dkt. 269 at 7-8.

14

Each of Snyders other arguments goes to the weight of the evidence and is directed at the ultimate conclusion of whether Snyders' "single leaflet" theory *is* sufficiently enabled and described. This, of course, is not the proper inquiry for exclusion. *Daubert*, 509 U.S. at 595 (explaining the preference for "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" when challenging expert testimony). And it is Snyders' theory that is self-defeating—if a valve element that consists of a single leaflet of a tri-leaflet design is outside the scope of the claims for the purposes of enablement as Snyders argues (Dkt. 581 at 8), then it is outside the scope of the claims for the purposes of infringement and Portico does not infringe. Because Snyders fails to identify any aspect of Dr. Yoganathan's rebuttal opinions that is unreliable or otherwise methodologically unsound, the Court should deny Snyders' Motion regarding those opinions.

### V. CONCLUSION

For the forgoing reasons, St. Jude respectfully submits that Snyders' Motion should be denied in its entirety.

| | |
|---|---|
| Dated: September 22, 2020 | Respectfully submitted,<br><br>/s/ *Joseph W. Winkels*<br><br>Joseph W. Winkels<br>MN Attorney No: 0349707<br>Alexander S. Rinn<br>MN Attorney No:0395616<br>Carlson, Caspers, Vandenburgh & Lindquist, P.A.<br>225 South Sixth Street, Suite 4200<br>Minneapolis, MN 55402<br>Telephone: (612) 436-9600<br>Facsimile: (612) 436-9605<br>jwinkels@carlsoncaspers.com<br>arinn@carlsoncaspers.com<br><br>Bryan S. Hales (admitted *pro hac vice*)<br>Kristina N. Hendricks (admitted *pro hac vice*)<br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, IL 60654<br>Telephone: 312-862-2000<br>Fax: 312-862-2200<br>bryan.hales@kirkland.com<br>kristina.hendricks@kirkland.com<br><br>*Attorneys for Defendants St. Jude Medical, Cardiology Division Inc., St. Jude Medical S.C., Inc. and St. Jude Medical, LLC* |